UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JERRY GLOVER, ET AL.                          CIVIL ACTION

v.                                            NO. 13-2984

DEPUTY ADAM PAILET, ET AL.                    SECTION "F"(3)

<u>ORDER AND REASONS</u>

Before the Court are two motions by the two remaining defendants, Rodney J. Strain, Jr., in his official capacity as Sheriff of St. Tammany Parish, and Deputy Adam Pailet: (1) motion for summary judgment; and (2) motion for partial summary judgment. For the reasons that follow, the motion for summary judgment is GRANTED, and the motion for partial summary judgment is DENIED as moot.

**Background**

This is a civil rights lawsuit filed under 42 U.S.C. § 1983 in which a family alleges that St. Tammany Parish Sheriff's Office Deputy Adam Pailet used excessive force in the shooting death of their son and brother, Jason Glover.

Shortly after 11:00 p.m. on Friday, March 8, 2013, Christie Babin called 911 from her house in Covington, Louisiana. She reported a domestic violence aggravated assault incident involving her boyfriend, Jason Glover. St. Tammany Parish Sheriff's Office

1

deputies responded to her house. Ms. Babin reported to the responding deputies that she had a heated argument with Jason Glover at his house in Abita Springs; that she had gone to Jason Glover's house to get her dog; that she sat in her car while Glover stood by yelling at her, and that he also spit on her through her partially rolled down window. Ultimately, she told deputies, Jason went inside his house and -- instead of returning with her dog, Max -- he returned with a handgun. Ms. Babin said she sped away as he fired one shot. Ms. Babin told responding deputies that she called 911 when she got home because "she was afraid that Glover was relocating to her home to kill her." According to the St. Tammany Parish Sheriff's Office Investigative Case Report, "[t]his information was broadcasted, via police radios, to responding deputies who were traveling to Glover's residence to investigate." In particular, the dispatcher "identified the male suspect [in an aggravated assault] as Jason Glover, who was intoxicated and threatened to kill the victim;" the dispatcher further advised law enforcement that "Glover was in possession of a handgun and [had] fired a gunshot." STPSO Deputy Adam Pailet and Corporal Michael Breazeale heard the police radio transmission of Ms. Babin's report. Because they were patrolling the same general Abita Springs area, Deputy Pailet and Corporal Breazeale (separately) drove to Jason Glover's residence to find and question him about Ms. Babin's allegations. When Deputy Pailet got close to Jason

Glover's house, Deputy Pailet heard the dispatcher announce that Ms. Babin "believed Glover was traveling to her residence to kill her and he was driving a silver Toyota pick-up truck."

Deputy Pailet arrived at Mr. Glover's house first.  He pulled into the driveway, left his marked police vehicle's bright headlights on,[1] and advised police dispatch that he had arrived at Mr. Glover's house and had that Jason's truck was on scene.  As he opened his door to get out of his vehicle, Pailet saw Glover himself and so advised dispatch.   Deputy Pailet says that he saw Jason exit the front door of the house and begin running toward the side of the house; the side of the house where Jason's pickup truck was parked and running in the driveway.[2]

Believing that he might be attempting to flee, Deputy Pailet yelled at Mr. Glover, identified himself as a law enforcement

---

[1] However, Pailet's vehicle's sirens and overhead police lights, which would have clearly indicated law enforcement presence, were not on.

[2] The plaintiffs dispute that Jason was in his house when Deputy Pailet arrived, suggesting that some evidence (cell phone records showing phone calls to Ms. Babin and the fact that Jason's cell phone was found in his truck after the shooting) might indicate that Jason was in his truck when Pailet pulled up.  That Jason's cell phone was found in his car after the shooting is irrelevant to determining the issues in this case, the defendants say.  Likewise, the defendants suggest, that Jason called Ms. Babin at 11:24 p.m. (according to cell phone records) fails to undermine Deputy Pailet's account that Jason ran from his house to his truck considering that the call log created by the STPSO shows that Deputy Pailet arrived at Jason's house at 11:34:53, about 10 minutes after the phone records show the calls he placed to Ms. Babin.

officer, and ordered him to stop.[3]  Mr. Glover did not respond to Deputy Pailet's commands; instead, Mr. Glover ran to his pickup truck while in a crouched position, opened the driver's side door,[4] and retrieved a handgun from inside the truck.[5]

By this time, Deputy Pailet had drawn his own pistol out of its holster.  When he saw the gun in Mr. Glover's hand, Deputy Pailet aimed his weapon at Mr. Glover, and ordered Glover to drop his gun.  Mr. Glover did not comply.  Instead, Mr. Glover raised his pistol, advanced at an angle toward Deputy Pailet, and, according to the deputy, it appeared that Glover -- who was looking toward Deputy Pailet and the high beams from Pailet's police unit -- "was attempting to acquire a target."  Deputy Pailet fired three rounds at Glover; at which point Glover falls to the ground on his right side but, according to Deputy Pailet, Glover "continued to

---

[3] The plaintiffs dispute whether or not Deputy Pailet yelled warning shouts and, if he did, they suggest Pailet has not consistently testified as to the content of his commands; no neighbor including Danny Tonagel (who lived about one quarter mile east of Jason Glover), nor proximate family members, heard yelling; only gun shots.  However, Corporal Breazeale reported that when he pulled up behind Deputy Pailet's car, he said that he observed Deputy Pailet standing outside of his patrol unit in the driveway shouting commands at Glover.

[4] When Mr. Glover opened the door to his truck, Deputy Pailet saw a small white dog jump out of the truck.

[5] The plaintiffs do not concede that Jason was armed; but, they suggest, even crediting Pailet's account that Jason was armed, the plaintiffs argue that a person's mere possession of a gun does not make him dangerous or does not justify shooting at the person.

point his weapon at [Deputy Pailet] attempting to acquire his target." After not more than a second or two, Deputy Pailet then fired three additional rounds at Glover, who died later at the hospital of his injuries.

Immediately after the shooting, Deputy Pailet and Corporal Breazeale[6] secured the scene as other first responders, including other law enforcement officers and an ambulance, arrived at the scene. Pailet and Breazeale repositioned themselves but took cover; peering around the house, they noticed that Glover was still breathing and that he was still clutching his gun in his right hand. Although he was unsure if Glover had been hit by the gunshots, Corporal Breazeale requested from central dispatch additional units and an ambulance.

Moments later, Corporal Pam Baily and Sergeant Gordon Summerlin arrived on the scene. Deputy Pailet and Corporal Breazeale continued to guard Glover from their covered position as Baily and Summerlin repositioned themselves; once cover was established, Summerlin then approached Glover from the rear yard and removed the gun from his hand. Noticing that Glover was bleeding from his forehead, Summerlin immediately notified central

---

[6] Corporal Breazeale states that, although he arrived on scene almost immediately after Deputy Pailet, by the time Breazeale exited his vehicle and walked to Deputy Pailet, the shooting was over. The plaintiffs dispute that Breazeale was on the scene; Jason's neighbor, Daniel Tonagel, and Jason's sister, Janice Glover Sullivan, say that they saw only one patrol car in the driveway when they arrived on the scene.

dispatch that rapid response emergency medical service was needed. Summerlin assumed command of the scene, and relieved Deputy Pailet of his duties due to his involvement and in anticipation of the necessary impending investigation.

Meanwhile, a neighbor, Daniel Tonegal, heard the gunshots.[7] As did Jason's mother, Bethany Glover, and Jason's sister, Janice Sullivan.[8]  When Mrs. Glover and her daughter, Jason's sister, Janice Glover, heard the gunshots, they went to the window, where they saw two police cars with flashing lights pulling up to Jason's house.  Worried, Janice Sullivan drove from her parents' house to Jason's house, where she saw a third police car in the driveway with only its headlights on.  Sitting in her car behind the police car with no blue lights on, she saw Jason's truck parked in his driveway under his carport with the driver's side truck door open. She saw her brother lying on the ground in the grass between the house and the carport; he was not moving.  He was apparently still alive, yet no one was tending to him.  When she exited her car and announced her presence to the three officers, one of them rushed to her and told her she could not approach; they did not answer her

---

[7] Daniel Tonegal lived about one quarter mile from Jason Glover.

[8] Jason's parents lived a short distance from their son; they lived in a house on the back of 20 acres of land in Abita Springs, and Jason lived in a house on the front of the same 20 acres of land. That night, Jason's sister, Janice Sullivan, was at her parents' house with her children.

questions.

On May 13, 2013 Jason's parents, Jerry and Bethany Glover, and Jason's sister, Janice Sullivan, sued Deputy Adam Pailet, Corporal Michael Breazeale, and Rodney J. "Jack" Strain, Jr., in his official capacity as Sheriff of St. Tammany Parish.[9]   The plaintiffs allege claims under 42 U.S.C. § 1983 for excessive force and denial of medical treatment in violation of the Fourth Amendment, as well as failure to follow departmental policy regarding use of deadly force, and as to the Sheriff, inadequate policies and procedures, and failure to train or supervise, as well as negligent hiring.  The plaintiffs also allege several state law claims.  Mr. and Mrs. Glover seek to recover from the defendants under state law theories of wrongful death and survival; Mrs. Sullivan alleges a bystander claim under Louisiana law; and, finally, the plaintiffs also allege state law negligence and respondeat superior.  On January 21, 2014, the Court granted the plaintiffs' motion to stay this case pending their counsel's treatment for serious health issues.  A few months later, the plaintiffs were granted permission to substitute counsel and reopen the case.  Invoking qualified immunity, Deputy Pailet and Sheriff Strain now seek summary judgment dismissing the plaintiffs' Section 1983 claims; they also urge the Court to dismiss the plaintiffs'

---

[9] On October 22, 2013, the Court granted the plaintiffs' motion to dismiss, without prejudice, their claims against Corporal Michael Breazeale.

7

derivative state law claims.  In the alternative, the defendants seek summary relief dismissing Janice Sullivan's state law bystander claim.

I.

A.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving

8

party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d
646, 649 (5th Cir. 1992).  Rather, he must come forward with
competent evidence, such as affidavits or depositions, to buttress
his claims.  Id.  Hearsay evidence and unsworn documents that
cannot be presented in a form that would be admissible in evidence
at trial do not qualify as competent opposing evidence.  Martin v.
John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir.
1987); Fed. R. Civ. P. 56(c)(2).  "[T]he nonmoving party cannot
defeat summary judgment with conclusory allegations,
unsubstantiated assertions, or only a scintilla of evidence."
Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal
quotation marks and citation omitted).  In deciding whether a fact
issue exists, courts must view the facts and draw reasonable
inferences in the light most favorable to the non-moving party.
Scott v. Harris, 550 U.S. 372, 378 (2007).  Although the Court must
"resolve factual controversies in favor of the nonmoving party," it
must do so "only where there is an actual controversy, that is,
when both parties have submitted evidence of contradictory facts."
Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir.
2013)(internal quotation marks and citation omitted).

*B.*

Where, as here, the defendants have advanced the affirmative
defense of qualified immunity, the usual summary judgment burden
shifts to the plaintiffs to show that the defense is not available.

9

Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010).

## II.

### A.

Title 42, U.S.C. § 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law; it provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

To establish § 1983 liability, the plaintiff must satisfy three elements:

> (1) deprivation of a right secured by the U.S. Constitution or federal law,
> (2) that occurred under color of state law, and
> (3) was caused by a state actor.

Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

### B.

When plaintiffs seek money damages from government officials for alleged violations of constitutional or statutory rights, officials sued in their individual capacities may invoke the defense of qualified immunity. Because it is an immunity from suit and not a defense to liability, courts are advised to resolve the issue "at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam).

10

"Qualified immunity shields government officials from civil damages liability," the U.S. Supreme Court has reiterated, "unless the official violated a statutory or constitutional right that was clearly established that the time of the challenged conduct." Reichle v. Howards, 132 S.Ct. 2088, 2093 (2012)(citing Ashcroft v. al-Kidd, 563 U.S. ---, 131 S.Ct. 2074, 2080 (2011)); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)(This doctrine protects government officials against individual civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(noting that "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008))(citations omitted); see also Bazan v. Hidalgo County, 246 F.3d 481, 488 (5th Cir. 2001)("even law enforcement officials who reasonably but mistakenly

commit a constitutional violation are entitled to immunity") (citation omitted); see also Brady v. Fort Bend County, 58 F.3d 173, 174 (5th Cir. 1995) (observing that "[q]ualified immunity represents the norm" and "is designed to shield from civil liability all but the plainly incompetent or those who violate the law.").

Put simply, a public official is entitled to qualified immunity unless his conduct violates constitutional law that was clearly established at the time of the defendant's actions. Thompson v. Mercer, 762 F.3d 433, 435 (5th Cir. 2014)(citing Freeman v. Gore, 483 F.3d 404, 411 (5th Cir. 2007)). Thus, in resolving a government official's qualified immunity defense, courts have traditionally applied the two-prong process articulated in Siegert v. Gilley, 500 U.S. 226 (1991) and confirmed by the Supreme Court again in Saucier v. Katz, 533 U.S. 194 (2001). First, the Court must determine whether the plaintiffs have shown a violation of a constitutional right. Id. at 201. The second inquiry requires the Court to consider "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009).[10]

---

[10] In Pearson, the Supreme Court receded from Saucier, in determining that, while the sequence articulated in Saucier is often appropriate, it is no longer mandatory; accordingly, the Court may consider these inquiries in any sequence and need not even consider both. See Pearson, 129 S.Ct. at 818-20 (reasoning that because the Saucier process sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on

Although the Supreme Court has left to the district court's discretion the sequence for undertaking these two inquiries, the Supreme Court has increasingly indicated a preference for first considering whether a purported right was clearly established by prior case law "without resolving the often more difficult question whether the purported right exists at all." See Reichle, 132 S.Ct. at 2093 ("This approach comports with our usual reluctance to decide constitutional questions unnecessarily."); see also Camreta v. Greene, 563 U.S. ---, 131 S.Ct. 2020, 2031 (2011)(observing that "our usual adjudicatory rules suggest that a court should forbear resolving this issue")(emphasis in original); see also Pearson, 555 U.S. at 238-39 (listing circumstances in which courts might be best served to bypass the first step of the Saucier process, such as "when qualified immunity is asserted at the pleadings stage, the precise factual basis for the plaintiff's claim or claims [is] hard to identify").

In other words, qualified immunity "protects 'all but the

---

difficult questions that have no effect on the outcome of the case...courts should have the discretion to decide whether that procedure is worthwhile in particular cases").

Step two of the qualified immunity analysis requires courts to determine whether the defendants' conduct "was objectively reasonable in light of clearly established law." Thompson v. Upshur County, Tex., 245 F.3d 447, 457 (5th Cir. 2001)(citations omitted). "Fair warning" is the touchstone of this analysis. Bush v. Strain, 513 F.3d 492, 501-02 (5th Cir. 2008) (citations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle, 132 S.Ct. at 2093 (quoting Camreta, 131 S.Ct. 2020).

plainly incompetent or those who knowingly violate the law,' so we do not deny immunity unless 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Morgan v. Swanson, 659 F.3d 359, 370-71 (5th Cir. 2011)(en banc)(internal quotations, citations, and footnotes omitted).   Once a defendant has invoked the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is unavailable.   See Collier v. Montgomery, 569 F.3d 214, 217-18 (5th Cir. 2009); see also McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002)(en banc).   "Although qualified immunity is 'nominally an affirmative defense," the plaintiff bears a heightened pleading burden 'to negate the defense once properly raised.'"   Newman v. Guedry, 703 F.3d 757, 761 (5th Cir. 2012)(citing Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008)).   "[E]ach individual defendant's entitlement to qualified immunity [should be examined] separately."   Jacobs v. West Feliciana Sheriff's Dept., 228 F.3d 388, 395 (5th Cir. 2000)(citation omitted).

Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."   Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

14

*C.*

To defeat summary judgment, the plaintiffs must show genuine disputes of material fact about whether (1) the defendant violated the plaintiff's constitutional right; and (2) the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the conduct.  <u>Poole v. City of Shreveport</u>, 691 F.3d 624, 627 (5th Cir. 2012).  The plaintiffs must show genuine disputes of material fact about both prongs, which need not be addressed sequentially.  <u>See</u> <u>Reichel v. Howards</u>, --- U.S. ---, 132 S.Ct. 2088, 2093 (2012)(noting that consideration of the second prong first "comports with [the] usual reluctance to decide constitutional questions unnecessarily.").   The Court addresses each of the plaintiffs' claims in turn.

1.  Excessive Force Claim

*(a)*

Asserting qualified immunity, the defendants submit that summary judgment dismissing the plaintiffs' Section 1983 excessive force claim against Deputy Pailet is warranted because his use of deadly force in response to the imminent threat posed when Jason Glover pointed a gun at him in a "tense, uncertain and rapidly evolving situation" was objectively reasonable in light of clearly established law.  The plaintiffs counter that Deputy Pailet created the dangerous encounter and, in so doing, he acted unreasonably by shooting Jason instead of (i) engaging Jason in dialogue, (ii)

waiting for backup, and (iii) taking cover.  All notwithstanding that Jason Glover clearly held a handgun during the encounter. Because the plaintiffs have failed to carry their burden to submit evidence that creates a genuine dispute as to a material fact concerning whether Deputy Pailet's conduct was objectively unreasonable in light of clearly established law, Deputy Pailet must prevail on his defense of qualified immunity as to the plaintiffs' excessive force claim.

To defeat summary judgment, the plaintiffs must show genuine disputes of material fact about whether (1) the defendant officer violated an individual's constitutional right against excessive force; and (2) the defendant officer's conduct was objectively reasonable in light of clearly established law at the time of the conduct.  Poole, 691 F.3d at 627.  The plaintiffs must show genuine disputes of material fact about both prongs.  To succeed on an excessive force claim, the plaintiffs must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."  Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks and citation omitted).  Failure to prove these elements triggers qualified immunity.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985).  When a Fourth Amendment

excessive force claim involves death, there is a clear seizure and an injury resulting from deadly force such that the only issue is whether the use of deadly force was reasonable. Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011). The reasonableness of an officer's use of force is an objective inquiry. Graham v. Connor, 490 U.S. 386, 397 (1989). Of course, a reasonableness inquiry calls for an examination of the totality of the circumstances. See Luna v. Mullenix, 773 F.3d 712, 719 (5th Cir. 2014)(cert. pending)(quoting Lytle v. Bexar Cnty., Tex., 560 F.3d 404, 411 (5th Cir. 2009)("There are few, if any, bright lines for judging a police officer's use of force; when determining whether an officer's conduct violated the Fourth Amendment, we must slosh our way through the factbound morass of reasonableness.")). The defense of qualified immunity must be assessed in the context of "what the officer knew at the time he acted, not on facts discovered subsequently." Luna, 773 F.3d at 718 (citations omitted). Thus, to withstand summary judgment on qualified immunity, the plaintiffs must show that Deputy Pailet's use of deadly force was objectively unreasonable "in light of the facts and circumstances confronting" the officer. Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 382 (5th Cir. 2009)(internal quotation marks and citation omitted).

In other words, the reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citation omitted). Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. Because an objective reasonableness inquiry does not lend itself to mechanical application, context is key. If an "officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others," then as a matter of law an officer's use of deadly force is not excessive. See Manis, 585 F.3d at 843. Although the Court must examine the totality of the circumstances, particular factors relevant to the reasonableness inquiry include: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officer's or others' safety; and (3) whether the suspect actively resisted arrest or attempted to flee. Graham, 490 U.S. at 396 (citing Garner, 741 U.S. at 8-9).

*(b)*

The parties' briefing focuses on the second prong of Saucier, in particular whether Deputy Pailet's conduct was objectively unreasonable. The defendants submit that Deputy Pailet's resort to deadly force was reasonably proportionate to the circumstances facing Pailet. The plaintiffs counter that Deputy Pailet created

18

the dangerous encounter and should have responded differently.

The second prong of Saucier calls for application of its own two-part test, inquiring first whether the allegedly violated constitutional right was clearly established at the time of the incident; and, if so, whether the defendant's conduct was objectively unreasonable in light of the then clearly established law. Lytle, 560 F.3d at 410-11. "A right is clearly established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer." Manis, 585 F.3d at 845-46.

By March 2013, it was clearly established that "Supreme Court precedent and cases in this circuit authorized deadly force when an officer had 'probable cause to believe that the suspect pose[d] a threat of serious physical harm.'" Manis, 585 F.3d at 845-46 (citing Garner, 471 U.S. at 11-12). More specifically, the Fifth Circuit has affirmed the district court's determination that police officers' response, in shooting and killing a man who confronted officers in his bedroom with a knife raised in his hand, was objectively reasonable. See Harris v. New Orleans Police Department, 2013 WL 1335613 (E.D. La. 2013)(Vance, J.), aff'd, 745 F.3d 767 (5th Cir. 2014), cert. denied, U.S. , 135 S.Ct. 137 (2014). The Fifth Circuit "has [even] found an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably

believe the suspect was reaching for a weapon." <u>Manis</u>, 585 F.3d at 844 (noting that the plaintiffs "do not dispute the only fact material to whether [the officer, who fired four shots at the suspect] was justified in using deadly force: that Manis reached under the seat of his vehicle and then moved as if he had obtained the object he sought."); <u>Ontiveros</u>, 564 F.3d at 383 n.1 (noting that "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity.")(citation omitted).  "If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, then the officer is immune from suit." <u>Manis</u>, 585 F.3d at 845-46.  It is underscored that "[t]his standard thus protects an officer with a mistaken, yet reasonable, understanding of the law from the 'hazy border between excessive and acceptable force.'" <u>Id.</u> at 846 (citations omitted).

Assessing the reasonableness of Deputy Pailet's conduct in shooting Jason Glover in light of this clearly established law, the Court considers whether Jason Glover's actions gave Deputy Pailet probable cause to believe that Glover posed "a threat of serious physical harm, either to [Pailet] or to others." <u>See</u> <u>Garner</u>, 471 U.S. at 11-12.  The <u>Graham</u> factors are instructive.  Deputy Pailet went to Jason's house to investigate a reported aggravated assault in which it was reported to Pailet that Jason had used a gun earlier that night; that upon Pailet's arrival Jason pulled a gun,

which he raised and refused to drop, clearly posed an immediate
threat to Deputy Pailet's safety.  See Graham, 490 U.S. at 396; see
also Rockwell v. Brown, 664 F.3d 985, 992 (5th Cir. 2011)(observing
that not all of the Graham factors need "be present for an
officer's actions to be reasonable; indeed, in the typical case, it
is sufficient that the officer reasonably believed that the suspect
posed a threat to the safety of the officers or others."), cert.
denied, 132 S.Ct. 2433 (2012).  The Court finds that the undisputed
material facts support a finding that Deputy Pailet acted in
conformance with an objectively reasonable officer at the scene of
a tense and rapidly evolving situation in which the suspect was
holding a gun and facing the officer; no facts in the record call
into question the objective reasonableness of Deputy Pailet's
resort to deadly force where, at the time of the shooting, Pailet
reasonably feared for his safety since Glover, armed with a gun,
posed an imminent risk of serious harm.

Here, the plaintiffs have failed to raise a genuine dispute as
to any material fact concerning the objective reasonableness of
Deputy Pailet's use of deadly force.  Pailet faced an imminent
threat of bodily injury or death and responded in kind.  Central to
this determination are these facts:  (i) Deputy Pailet had been
advised by dispatch prior to arriving at Jason Glover's residence
that Jason was intoxicated, angry with his girlfriend, that he had
threatened her and had fired a gun in her presence, and that the

girlfriend believed Jason was traveling to her residence to kill her;[11] (b) Deputy Pailet has testified that he perceived Glover to disregard his commands; (c) Deputy Pailet has testified that he saw Glover retrieve a gun from his truck, that he feared for his life when Jason raised the gun, and that Pailet started firing after he confirmed that he saw a gun in Jason's hand and that he continued firing when Jason, even after falling, failed to drop his weapon from his hand (which was found in his hand or nearby after the event); (d) Deputy Pailet has testified that he continued to shoot at Jason after he fell because, even though he was down on the ground, Jason's head was still raised, as was his gun, in an apparent attempt to aim at Pailet; (e) Summerlin retrieved Jason's gun,[12] which was still in Jason's hand.  For the most part, or at least in all material respects, these facts are uncontroverted by

_____

[11]Insofar as the parties dispute whether the facts underlying this dispatch report are true, the Court notes that resolution of any dispute regarding whether, in fact, Jason threatened to kill his girlfriend and shot at her is irrelevant to the only issue presented by Deputy Pailet's motion for summary judgment on the excessive force claim.  True or not, what is significant about the report made by Ms. Babin is that it is undisputed that Deputy Pailet was informed of the alleged aggravated assault before arriving at Jason's house.

[12]The plaintiffs resist conceding that Jason was armed at the time Pailet shot him, but they relent that even if it is true that Jason was armed, Deputy Pailet had other options at his disposal besides shooting Jason.  Notably, however, they have no evidence to support the cover-up that they speculate occurred.  The plaintiffs point to no evidence that would call into question whether or not the gun found in Jason's hand was Jason's gun. That, on this record, is not disputed by the evidence.

other evidence in the record.

The plaintiffs advance several arguments. None creates a genuine dispute as to any material fact regarding the reasonableness of Pailet's use of deadly force. Foremost, the plaintiffs insist that the objective reasonableness of Pailet's use of deadly force is for the jury. But the plaintiffs' argument is undermined by the nature of qualified immunity and the many cases assessing the reasonableness of the use of deadly force that are decided on summary judgment. Second, underscoring that Deputy Pailet is the sole living witness to the moments before the shooting, the plaintiffs suggest that "[t]he jury in this matter could very reasonably believe that Defendants' version of facts lacks credibility." But the plaintiffs "may not defeat summary judgment by merely asserting that the jury might, and legally could, disbelieve the defendant[]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). That is, the plaintiffs cannot simply submit that there is something inherently unbelievable about the officer's testimony; rather, the plaintiffs must offer no evidence that, if believed by a jury, could support a finding that Pailet acted unreasonably. See LaFrenier v. Kinirey, 550 F.3d 166, 167-68 (5th Cir. 2008)("The appeal sounds a single key theme: that summary judgment could not be granted because Lafrenier is entitled to attack the credibility of the officer's testimony. As a matter of law this is incorrect."). Third but relatedly, the plaintiffs

submit a host of possibilities that they insist defeat qualified immunity; they speculate that it is possible that (a) Deputy Pailet did not as he suggests orally command Jason Glover to stop and show his hands; (b) Jason did not have a gun in his hand but, rather, Deputy Pailet or some other responding law enforcement officer planted the gun in Jason's hand after he was shot by Pailet; (c) Deputy Pailet's conduct was not the most reasonable because he had other alternatives, such as waiting for backup, taking cover, using his police blue lights, or negotiation.

Insofar as the plaintiffs seek to cast doubt on Pailet's account of the events because, they say, his account is self-serving and untruthful, the plaintiffs fail to consider that, even in cases in which the defendant law enforcement officer is the only person offering an account of his actions, the officer's actions, if not controverted by other competing material evidence in the record, may still be found to be reasonable, and that officer's account may suffice to grant qualified immunity. See Ontiveros, 564 F.3d at 383; see also LaFrenier, 550 F.3d at 168 (noting that the plaintiff must put material facts in dispute even where the movant relies on the testimony of an interested witness; "[t]he Fifth Circuit has . . . refused to allow a nonmovant to defeat summary judgment where, as here, he or she 'points to nthing in the summary judgment record that casts doubt on the veracity of the [witness's] version of the events.").  That Pailet's narrative is

the only full account does not *per se* cast doubt on its veracity; the plaintiffs must offer or point to other *evidence* that contradicts or undermines his account; skepticism is insufficient. See Ontiveros, 564 F.3d at 383 (upholding as reasonable police officer's conduct when he was the only witness to the shooting). Admittedly, this is difficult where, as here, Jason -- the only other witness to challenge Pailet's account -- is deceased. Nevertheless, there is uncontroverted evidence that corroborates the material portions of Pailet's account, and the plaintiffs offer no evidence that would undermine a finding that Pailet acted reasonably under the circumstances. Focusing on the seconds just before Pailet fired on Glover,[13] and putting aside the facts that the plaintiffs submit are disputed:[14] Jason had retrieved a gun,

---

[13] "The excessive force inquiry is confined to whether the [officer or another person] was in danger at the moment of the threat that resulted in the [officer's use of deadly force]." See Harris v. Serpas, 745 F.3d 767,773 (5th Cir. 2014)(citations omitted). More simply put, "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or others." Ontiveros, 564 F.3d at 382 (citation omitted)(noting that the officer who employed deadly force "is the only witness to those events immediately surrounding the shooting").

[14] First, insofar as the plaintiffs dispute whether Pailet yelled commands (Pailet says he did, Breazeale confirms that he did, but the plaintiffs submit that they would have heard yelling because they were able to hear the gunshots), the Court makes no finding regarding whether or not Pailet yelled commands to Glover or, if he did, what in substance he yelled. That Pailet yelled or did not yell a particular command is not material; its resolution would not affect the outcome of the action. See Wyatt v. Hunt Plywood Co., 297 F.3d 405, 409 (5th Cir. 2002). Second, insofar as the plaintiffs submit that whether or not Jason had a gun is a

which he continued to hold, raised in his hand[15] as he faced
Pailet,[16] who had pointed his own gun at Jason from about 60 feet

_____

triable issue, the Court finds that the issue is not genuine.  "An
issue is 'genuine' if it is real and substantial, as opposed to
merely formal, pretended, or a sham." Bazan v. Hidalgo County, 246
F.3d 481, 489 (5th Cir. 2001).  The plaintiffs appear to concede
that Jason had a gun by arguing that, even if he did, Pailet
nonetheless acted with excessive force by firing on Jason.  But
even if they do not concede that Jason had a gun in his hand when
Pailet shot him, the Court finds that it is a sham dispute because
the plaintiffs have offered no evidence that would support their
theory that Jason may not have been armed at the time he was shot.
Unlike Bazan, in which the Fifth Circuit merely held that denial of
summary judgment based on genuine dispute of material facts was not
reviewable, there is evidence corroborating Pailet's account
insofar as he claims that Jason was armed.  A gun was retrieved at
the scene by another officer *from Jason's hand* or next to him; the
plaintiffs have no evidence that would support a finding that this
was some stranger's random gun planted on Jason. (Indeed, if there
was evidence that cast doubt on whether Jason owned a gun, the gun
found at the scene, there would be evidence submitted in the record
on the issue).  This fact is critical and the plaintiffs offer up
no competent evidence that would call it into question.  If the
plaintiffs had some evidence to support their speculation that
Jason did not have his gun in hand when he was shot, then the
inference they suggest the jury could draw, that Pailet could not
have reasonably perceived a threat, might be a genuinely disputed
issue as to a material fact.  Although the Court refers again to
those cases upholding a finding of qualified immunity when the
record establishes that the officer who used deadly force
reasonably believed that the suspect was (merely) reaching for a
weapon (even where no weapon was found after the shooting).


[15]Other officers observed that Glover had a gun in his
hand even after he had been shot:  Breazeale saw Glover after he
had been shot, and even if the Court disbelieves that Breazeale was
on the scene based on the plaintiffs' contention that Jason's
sister did not see a second police car parked behind Pailet's, it
was Summerlin, who arrived on the scene after the shooting, who
says he removed a gun from Glover's hand.

[16]The plaintiffs do not dispute that the location and
nature of the gun shot wounds support a finding that Glover was
facing Pailet.

away.  This was the tense scene that Deputy Pailet faced when he made the split-second decision to use deadly force.

The outcome of the objective reasonableness inquiry is not altered by viewing in the plaintiffs' favor their submitted version of events.  Even assuming that Pailet observed that Glover was blinded by headlights, even indulging plaintiffs' spin that Pailet must have aggressively approached Glover without warning shouts, and even though it is undisputed that Glover never fired his gun, at most, a jury might be entitled to infer that Jason was startled.  But the plaintiffs' spin on the facts does not change the critical inquiry here: whether a reasonable officer in Pailet's shoes reasonably perceived that Glover posed an imminent threat of bodily harm or death; indulging the plaintiffs' take on the facts does not undermine the objective threat posed to Pailet by a man standing 60 feet away, holding a gun, facing him, who had reportedly had an altercation with his girlfriend, and fired a shot at her as she fled him.  Furthermore, by insisting that Deputy Pailet should have used his blue lights, or could have waited in his car for backup, taken cover, or negotiated with Glover, the plaintiffs improperly ask the Court to assess the reasonableness of Pailet's use of force "with the 20/20 vision of hindsight."  See Graham, 490 U.S. at 396 (citation omitted).  It is settled that the Court's inquiry on excessive force is more confined; the Court asks only whether the officer or another person was in danger at the moment of the threat

27

that resulted in the use of deadly force.  That is, even if the Court were to assume that Deputy Pailet negligently failed to employ his police lights, did not yell clear commands, or negligently failed to attempt to negotiate with Jason, such a determination would not undermine a finding of objective reasonableness in his use of deadly force under the circumstances.  Cf. Young v. City of Killeen, 775 F.2d 1349, 1353 (5th Cir. 1985)(finding that officer's use of deadly force was reasonable even where the arrest was "negligently executed"); Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir. 2008)("the magistrate judge improperly criticized [the officer's] failure to consider the use of non-lethal force or to employ a crisis negotiator").

Here, the evidence of record shows that Pailet's use of deadly force was objectively reasonable in light of clearly established law.  The undisputed facts show that Deputy Pailet reasonably believed that Jason Glover's retrieval of a handgun which he pointed at Pailet posed a significant threat of death or bodily injury.  Plaintiffs' final contention that firing six shots was excessive is unsupported by the summary judgment record.  The plaintiffs urge the Court to focus not on the moment before Pailet fired the first shot but, rather, to isolate focus on the moment before Pailet fired the fatal shot; plaintiffs note that their expert opines that the sequencing of the wounds suggests that the first shot to Jason's head, while not fatal, rocked him back to the

28

ground, and would have at least dazed Jason such that a jury could infer that Jason was no longer posing a threat after receiving this head wound.[17]  Not only do plaintiffs fail to cite any controlling law in support of splicing the reasonableness inquiry as to deadly force interrupted by a brief pause, but, again, the plaintiffs overlook the critical inquiry, which focuses on whether a reasonable officer in Pailet's position reasonably perceived an imminent threat of bodily harm.  "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or others."  Ontiveros, 564 F.3d at 382; Thompson v. Mercer, 762 F.3d 433 (5th Cir. 2014) (observing that the "use of deadly force is not unreasonable when an officer would have reason to believe the suspect posed a threat of serious harm to the officers or others.")(citation omitted).  That plaintiffs believe that Jason could no longer adequately provoke Pailet once he had fallen down[18]

---

[17] On this point, the plaintiffs urge a hopeful inference with no basis in record fact: they essentially urge the Court to disregard the first three shots, which the plaintiffs seem to concede were reasonable if Deputy Pailet had seen that Jason had a gun.  In this regard, the plaintiffs appear to attempt to create a factual dispute about whether or not Jason was sufficiently immobilized after the first three shots (one of which had hit him in the forehead) such that it is for the jury to determine whether it was unreasonable for Pailet to fire three more shots because it could be that Pailet could not have reasonably feared for his safety once Jason was knocked off his feet.

[18] The plaintiffs believe that Pailet is lying when he says that he continued firing until he no longer saw Jason trying to acquire him as a target with his gun raised.

is insufficient where, as here, the plaintiffs point to no evidence that raises a genuine dispute as to a material fact concerning whether Pailet's resort to deadly force was unreasonable.  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).  They offer no evidence that would call into question Pailet's account; plaintiffs' experts simply question whether the fatal shot was necessary.  But that is not the issue presented here: whether under the law in effect at the time Pailet shot Glover, no reasonable officer could have believed deadly force was lawful when a suspect retrieved a gun and continued to point it at the officer.  See Manis, 585 F.3d at 846.  The standard applicable to qualified immunity inquiries respecting deadly force "protects an officer with a mistaken, yet reasonable, understanding of the law from the 'hazy border between excessive and acceptable force.'"  See id. at 846 (citation omitted).  At the time of the shooting, it was clearly established that deadly force is authorized when an officer had "probable cause to believe that the suspect pose[d] a threat of serious physical harm."  Garner, 471 U.S. at 11-12.  The Court finds that controlling authority did not prohibit Pailet's use of deadly force in the situation confronting him.  And "even if

contrary authority existed, the 'cases taken together [would] undoubtedly show that this area is one in which the result depends very much on the facts of each case' and certainly would not 'clearly establish' that [Pailet's] conduct violated the Fourth Amendment." See Manis, 585 F.3d at 846 (citation omitted).

Here, the undisputed circumstances presented to Deputy Pailet confirm that he was reasonable in believing that Jason posed an immediate threat to his safety; Jason armed himself and pointed his gun at Pailet. Pailet confirmed that Jason had a gun before he fired upon him. The Fifth Circuit has upheld use of deadly force in hazier situations; situations in which the police officer merely believed a suspect might be reaching for a weapon. Jason had a gun in his hand. Plaintiffs have failed to overcome Deputy Pailet's defense of qualified immunity.

## 2. Failure to Render Medical Care

The defendants seek summary judgment dismissing the plaintiffs' claim that Deputy Pailet unreasonably refused to provide adequate medical treatment, or unreasonably delayed in providing medical treatment, immediately following the shooting. The defendants submit, and the record supports, a finding that emergency medical services were called immediately after Jason was disarmed. Failing to offer any legal or factual support for their medical care claim, the Court finds that the claim is abandoned and, if not abandoned, unsupported such that the defendants are

31

entitled to judgment as a matter of law dismissing the claim.[19]

*D.*

The defendants also seek to dismiss on summary judgment the plaintiffs' claims asserted against Sheriff Strain.  The defendants submit that the plaintiffs have not made any allegations that Sheriff Strain was personally involved in the asserted constitutional deprivations and that he cannot be vicariously liable.  The plaintiffs counter that the Court should not dismiss their negligent hiring, inadequate training, and inadequate supervision claims.

In § 1983 claims, supervisory officials are not liable for the actions of subordinates under any theory of vicarious liability. James v. Texas Collin Co., 535 F.3d 365, 373 (5th Cir. 2008).  A sheriff not personally involved in the acts that are alleged to have deprived plaintiff of his constitutional rights is only liable under § 1983 if: (1) the sheriff failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.  Id.  "Proof of more than a single instance of the lack of training or supervision causing a violation of

---

[19]The plaintiffs wholly fail to mention their medical care claim in their opposition papers.

constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." Id. (citation omitted)(The plaintiff must generally demonstrate a pattern of similar violations, and the "inadequacy of training must be obvious and obviously likely to result in a constitutional violation").

Here, the plaintiffs are charged with establishing that Sheriff Strain was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation. James v. Texas Collin Co., 535 F.3d 365, 373 (5th Cir. 2008). The plaintiffs have established neither. Insofar as the plaintiffs' negligent hiring, inadequate training, and inadequate supervision claims are derivative of their excessive force claim against Deputy Pailet, the claims fail as a matter of law because they have failed to show that there was a constitutional violation in this case. The Sheriff's motion for summary judgment dismissing the plaintiffs' § 1983 claims must be granted.

III.

Finally, the defendants urge dismissal of the plaintiffs' state law claims. Insofar as the plaintiffs' state law claims are derivative of their § 1983 claims, the claims must be dismissed. However, the defendants fail to brief the Court on the extent to which the plaintiffs' state law claims are derivative of their §

33

1983 claims.  Nevertheless, the plaintiffs appear to concede that their state law claims are entirely derivative of their § 1983 claims, which the Court has determined must be dismissed on summary judgment.

Accordingly, the defendants' motion for summary judgment is GRANTED, and because the defendants' motion for partial summary judgment was advanced only in the alternative, the motion is DENIED as moot.  The plaintiffs' claims are hereby dismissed.

New Orleans, Louisiana, May 13, 2015

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE